BAILEY, impleaded with Green, *appellant*, and BURTON
and others, *respondents*.

Where A. in *embarrassed circumstances*, executed a mortgage to B. his *brother-
in-law*, of various articles of personal property, worth probably over $500, re-
mained in possession of the property, and subsequently disposed of a valuable
portion of it; which mortgage was executed for the ostensible purpose of in-
demnifying B. against a responsibility assumed for A. to the amount of $100,
but was conditioned for the payment of $300, *it was held*, on a bill filed by
the creditors of A. that the mortgage was *fraudulent*, although previous to
the attaching of the *liens* of the creditors the mortgage was reduced down to
the sum for which the mortgagee was bound as security, and the property
was actually delivered.

On a bill filed by the creditors, that B. might be compelled to receive what was
equitably and justly due to him, suggesting however fraud in the mortgage,
and praying general relief, *it was held*, that under the prayer for *general
relief*, it was competent to a court of equity to set aside the mortgage as
fraudulent, the facts warranting such conclusion, although the *specific relief*
asked was permission to redeem.

Under the general prayer, the complainant is entitled to any relief consistent
with the case made, though inconsistent with the specific relief prayed for.

A *justice's judgment*, where the amount is $100 or upwards, is as well entitled
to the aid of a court of equity, as the judgment of a court of record, and
that as well when the judgment is obtained upon *attachment* as other-
wise.

Several judgment creditors, the joint amount of whose judgments is $100, or
upwards, may unite in a bill for discovery, and to remove impediments at
law, created by the fraud of their common debtor.

The mortgagor of a chattel having the right of possession for a definite period,
has an interest which may be sold by execution; the purchaser acquires
the right of possession and the absolute ownership, subject to the incum-
brance.

Until *assignment* by an insolvent debtor petitioning for his discharge, the
property inventoried by him remains in him, and his interest in it passes by
a conveyance voluntary made, or by operation of law, notwithstanding his
petition.

APPEAL from chancery. On the 1st November, 1827, three
several judgments were rendered in a justice's court in favor
of the respondents, on *attachments* issued against the property
of one John Green, one of which was for $33,73, the second for
$19,97, and the third for $51,81. Executions were issued on
the judgments, and on the 21st November and 8th of Decem-

ber a pair of horses, a coachee and a set of harness were sold by virtue of the same for the sum of $104,84, and bid in for the *benefit of the plaintiffs*. One of the horses sold was in *Green's* possession when the attachments were issued, and the residue of the property was in the possession of *Bailey*. The day succeeding the service of the attachments the horse which was in Green's possession was transferred to the possession of Bailey. The plaintiffs understanding that Bailey claimed to hold the property under a *mortgage*, offered to pay him $85, the balance appearing to be due thereon, and extended the offer to $100, but Bailey claiming a sum beyond that amount, they refused to pay, and filed a bill in chancery, before the judge of the fourth circuit, setting forth that Bailey pretended that the consideration of his mortgage was for money due him on account, and charging that nothing was due to him; that from the mortgage and endorsements thereon, $85 appeared to be due, and that they, the complainants, had offered Bailey $100 in redemption of the mortgage, which he had refused to accept; that they had been informed and believed that the mortgage was given *to defraud the creditors of Green*. The bill prayed a discovery of the true consideration of the mortgage, whether the same was a *bona fide* consideration, and not a fraudulent mortgage; that Bailey might be compelled to receive what should appear to be equitably and justly due, which they averred themselves ready and willing to pay, and that he might be compelled to relinquish his claim under the mortgage, and that an injunction might issue, restraining him from commencing any suit for the recovery of the property sold under the executions, or for any act done under the same, and also praying *general relief*.

Bailey put in an answer, and Green suffered the bill to be taken *pro confesso*. From the answer and proofs in the case, the following facts appeared: On the 20th August, 1827, Bailey, as the surety of Green, signed a note to one Palmer, for $100, payable in *eleven months* from date, and Green promised Bailey ample security for so doing. On the 23d *August*, Green accordingly had a bill of sale of certain property drawn, which was executed and delivered to Bailey, by which he transferred to Bailey two coaches and the harness of same, a

pleasure sieigh, a waggon and two pair of horses, *conditioned* to be void on the payment of $300 on the first day of *January* then next ; the property remained in the possession of Green. In *September*, Green sold at *Syracuse* one of the coaches, a set of harness and a pair of horses, part of the property included in the bill of sale, and on his return about the 1st October, to *Saratoga Springs*, where he and Bailey resided, informed Bailey of the sale, and told him he would not be able to pay the note to *Palmer*, and that he must take property enough to secure himself. Whereupon Bailey agreed to take the remainder of the property mentioned in the bill of sale, except the sleigh and waggon, and to pay the note given to Palmer. An endorsement of $200 was made upon the bill of sale, bearing date as of 12th *September*, 1827, and the *property was delivered* to Bailey, who on the next day took home the same, except one horse, left in the possession of Green. A few days afterwards a further endorsement was made on the bill of sale of $15, in consequence of Bailey relinquishing to a son of Green the sleigh and waggon mentioned in the bill, Green having transferred those articles to his son. In the summer of 1827, Green was notoriously insolvent; on the 19th *October* he applied for a discharge as an insolvent debtor, and an order for his creditors to shew cause was made on that day, and on the 15th *December* he executed an assignment of his property, and obtained his discharge. Green and Bailey are brothers-in-law.

In August, 1828, the cause was brought to a hearing on the pleadings and proofs, before the *circuit judge* of the fourth circuit, who *held* the mortgage to be fraudulent, on the ground of its having been originally given for a sum three times greater than what was just; and that the reduction of the sum by endorsement and the subsequent delivery of the property was a mere continuation of the original fraud, on the principle that an instrument once fraudulent is always fraudulent, on the authority of the case in 5 Day's R. 341, and he accordingly declared the mortgage and every thing done under it to be void, and the levy and sale by virtue of the executions to be valid, and decreed the mortgage to be *cancelled*, and ordered the defendants to pay costs, &c. The defendants *appealed* to the chancellor, who decided that the complainants having a

common interest to set aside the mortgage, if fraudulent, might properly join in a suit for their common benefit ; that although the judgments against Green were only *prima facie* evidence of indebtedness, such evidence was sufficient, until rebutted ; that by the assignment, the equity of redemption in the property in question was vested in the assignee of Green, and was not the subject of sale, and that therefore the complainants were not entitled to *redeem ;* but that although the bill asked for a redemption if there was any thing honestly due, it also charged *the mortgage to be fraudulent,* and that the *prayer for general relief* was broad enough to cover the decree for setting it aside, if found to be fraudulent. The chancellor concurred in opinion with the circuit judge that the mortgage was originally fraudulent, and that the last transaction was tinctured with the original fraud ; he therefore *affirmed* the decree of the circuit judge with costs. The defendant Bailey appealed to this court.

*J. Ellsworth,* for appellant. The bill was a bill to *redeem,* and not to set aside the mortgage for *fraud,* and yet the decree sets aside the mortgage on the latter ground, although fraud is not alleged in such manner as to entitle the complainants to relief. Where fraud is relied on, it must be distinctly charged, and not rest in inference. There is no charge that Bailey took, accepted, or held the mortgage with a fraudulent intent. The complainants were not entitled to the aid of a court of equity, the judgments not being judgments of a court of common law, but obtained by a special statutory proceeding ; besides they were judgments of a court of inferior jurisdiction, which are not aided by chancery. Cooper's Pl. 33. Jeremy Eq. Juris. 268, 551.   2 Johns. Ch. R. 296.   4 id. 671. 6 id. 139.   1 Hopkins, 59.   20 Johns. R. 554.   They were not *conclusive* against Green, being obtained on attachment, 6 Cowen, 598, and gave no right to the complainants to unite in a bill in equity, two of the judgments being for amounts less than what the court of chancery takes cognizance of. The property in question belonged to Bailey, under the assignment of Green, as an insolvent debtor. Green's petition was presented on the 19th *October,* and although the assignment

was not executed until the 15th of December, the property passed as it existed on the day of presenting the petition. 1 R. S. 468, § 19. 2 Paige, 289. 4 Cowen, 610. The judgments on the attachments were not obtained until the 1st of November, and the property in question was not liable to executions issued on such judgments.

S. *Stevens*, for respondents. The reason given by Jeremy why chancery will not aid *inferior courts* is, that such courts can themselves grant the remedy asked for. Jeremy Eq. Juris. 552, 4. Such reason does not apply to justices' courts in this state. Chancery aids where a court of law cannot enforce its judgments, and no reason can be given why that aid should not be extended as well to the enforcement of justices' judgments as the judgments of courts of record. Chancery will interfere, although there be no return of an execution at law, if there be an undue obstruction of an execution, or if a fraudulent title to property be set up, a bill may be filed to remove the obstruction, or disencumber the property of such title. 4 Johns. Ch. R. 677, 687. 1 Paige, 308. If the judgments against Green were not conclusive, they were at least *prima facie* evidence of indebtedness, which is sufficient, until rebutted. The property having been brought in for the joint benefit of the plaintiffs in the executions, they had a right to unite in a bill in chancery. 4 Cowen, 682. 6 Johns. Ch. R. 339. Under the prayer for *general relief*, the mortgage might well be set aside for *fraud;* any relief consistent with the case made out by the bill may be granted. 2 Atk. 141. 3 id. 124. 2 Peters' R. 612. 13 Vesey, 119. 1 Johns. Ch. R. 117. The mortgage was fraudulent in its inception, and being so, could not be the basis of a title. The reduction of the amount and the delivery of the property was but a continuation of the original transaction; the original bill of sale should have been surrendered, if it was intended to claim any thing under the subsequent agreement. 5 Day, 341. 15 Johns. R. 583. 5 Cowen, 571. Nothing can be claimed under Green's assignment as an insolvent debtor; the property did not pass until the assignment. Did property in such cases pass from the

time of presenting petition, it would be a most convenient mode of eluding creditors. Besides, no title under the assignment is set up in the answer.

The following opinions were delivered :

By the CHIEF JUSTICE. The bill filed by the respondents is not drawn with technical precision, but the object clearly is to call upon the appellant to discover the consideration of the mortgage, and to answer whether it is not fraudulent and void ; and if valid, then that the appellant may be compelled to receive what should appear to be justly and equitably due. The bill contains a prayer for specific relief, and also the general prayer. The specific relief prayed for is to be permitted to redeem ; under the general prayer, the complainant is entitled to any relief which is consistent with the case made in the bill, even though inconsistent with the specific relief prayed for. 1 Johns. Ch. R. 117, and cases there cited. The bill calls for a discovery, that the court may judge whether there was any consideration, or whether the mortgage be not fraudulent ; and it charges that when the mortgage was given there was nothing due to Bailey from Green. There is a case made by the bill, therefore, which if supported by proof, is sufficient to sustain the decree. The defendant in the court below was not taken by surprise ; he understood that the complainants had alleged fraud in taking the mortgage, and that there was no consideration for it. The answer and the proof both relate to the question of consideration and of fraud in the mortgage, as well as to the amount claimed to be due by the defendant. From the testimony it appears that Green, in embarrassed circumstances, executed to Bailey, his brother-in-law, a mortgage upon nearly all his property for the payment of $300, when in point of fact, there was nothing due. Bailey had signed a note with Green for $100. I can see no objection to a surety's taking reasonable security for a responsibility incurred ; but to secure $100, it should not cover $5 or $600 worth of property, nor be conditioned for three times the amount of the responsibility. The fact that complete indemnity was refused is strong proof of fraud. The mortgage was clearly

fraudulent in its inception, and has not been purged from that fraud. Whether an instrument originally fraudulent, always continue so, is a question not necessarily presented by this case. These remarks dispose of two of the points raised upon the argument: 1. That the bill was not properly framed to support the decree declaring the mortgage and every thing done under it fraudulent and void, and ordering it to be delivered up to be cancelled; and 2. That the mortgage was in fact fraudulent, and therefore void.

It was, however, further objected, that the complainants in the court below had no right to the aid of a court of equity to enforce an execution at law for several reasons. 1. It was said that the judgments are not judgments of a court of common law. One of the principles established in the case of *Hendricks* v. *Robinson*, 2 Johns. Ch. R. 296, is, that a court of chancery ought to lend its aid to a judgment creditor to enforce a judgment at law, by compelling a discovery and account, against the debtor, or any other person who may have placed the debtor's property beyond the reach of an execution at law. In *Brinkerhoof* v. *Brown*, 4 Johns. Ch. R. 671, it was decided that the true rule is, " That to procure relief in equity by a bill brought to assist the execution of a judgment at law, the creditor must shew that he has proceeded at law to the extent necessary to give him a complete title. If he seeks aid as to real estate, he must shew a judgment creating a lien upon such estate; if he seeks aid in respect to personal estate, he must shew an execution giving him a legal preference or lien upon the chattels." And in *Brinkerhoof* v. *Brown*, 6 Johns. Ch. R. 139, it was held, that different judgment creditors may unite in one bill for discovery and account, to remove impediments at law created by the fraud of their common debtor.

There is nothing in these cases defining the *courts* in which the judgments must be entered to be entitled to this aid, only that they must be judgments at law. A justice's court is a court of law; it is created by statute, and so is the court of common pleas. But it is said, it is not a court of record; this aid is not confined to judgments in courts of record. Justices' courts are an highly important branch of our judicial estab-

ALBANY,
Dec. 1831.

Bailey
v.
Burton.

lishment.    The opinion is entertained by many who have good opportunities of judging, that judgments are rendered in justices' courts amounting in the aggregate to more than the judgments rendered in the supreme court.    Whether the fact be so or not, we all know that the amount is great, and every justice has jurisdiction upon confession to the amount of $250. If this remedy were denied to plaintiffs in those courts, a great amount of property might be fraudulently disposed of with impunity.    The revised statutes deny this proceeding where less than $100 is in dispute; and though those statutes do not govern this case, they shew the opinion of the legislature as to the amount for which courts of equity should lend their aid.

2. It was objected that these judgments were obtained upon attachments.    When suits are commenced by attachments, they are not therefore mere proceedings *in rem;* the judgment is a valid judgment, and may be enforced by execution in the same manner as if the defendants had appeared.    It has been decided in the supreme court that such a judgment creditor may redeem, if his judgment is a lien upon the land sold, and that a judgment obtained upon attachment is of equal force with one rendered upon personal notice, except as to the defendant's right of set off.    5 Cowen, 17.    The judgment is conclusive, except that in an action upon that judgment, or in any analogous proceeding, a defence may be made to it.    It cannot be questioned collaterally in any other manner, nor can execution be stayed.    From these remarks and the cases above referred to, the objections are untenable, that the amount is too small, and that the plaintiffs could not unite their claims.

3. The third objection under the appellant's second point was that the judgments are satisfied by the sale of property. This is not quite true in point of fact; but if it were, it would not in this case be a valid objection to the plaintiff's right to the relief sought by their bill.    They wish to remove an impediment to their quiet enjoyment of the property purchased, the defendant's mortgage casting a cloud upon the title to it. The plaintiffs in the court below state that the sale of the property mortgaged was void and of no effect as to them; so says the defendant; the circuit judge says the sale was valid; and the chancellor understands the supreme court as having

decided that an equity of redemption in personal property is not a subject of levy and sale under an execution. I apprehend there is some mistake as to this point, though not material perhaps in this case. It was held by Chancellor Kent, in *Hendricks* v. *Robinson*, above cited, that a mere equity in the proceeds of personal property cannot be sold on execution. There property had been assigned for the payment of debts, and to indemnify against responsibilities incurred ; and from the statement of the assignees, there would still be a balance due them after the appropriation of the property assigned. The law, however, would hold the assignees liable to account for any balance which might be in their hands after indemnifying themselves. Executions had been issued after the assignment, and the chancellor says, " I cannot see upon what principle the execution affected or touched the residuary equitable interest of the Franklins in the property which had been assigned. Again ; " If the execution cannot sell, there is no reason why it should affect or bind a mere equity, and the doctrine would be equally inconvenient and absurd. The party's only remedy, if he wishes to prevent the assignment or release of a chose in action, is by application to this court ; and without such aid, the validity of the transfer will depend entirely upon the question of consideration and fraud." In *Marsh* v. *Lawrence*, 4 Cowen, 461, it was decided that the equity of redemption on the mortgage of a chattel existing in that case, could not be sold on execution. The reporter has indeed stated it as a general proposition ; but it will be seen from the opinion of the court, that that doctrine was intended to apply where the mortgagor had no right of possession for any definite period. All the interest the mortgagor had, if any, was an equitable right to any surplus which might remain in the hands of the mortgagee after a sale by him. But when the mortgagor has a right to redeem, and a right to the possession for a definite period before the property can become forfeited, and liable to be taken and sold by the mortgagee, the mortgagor has an interest which may be sold on execution. The purchaser in such case takes the property subject to the incumbrance ; he purchases the right of the mortgagor, which is a right to the possession and the absolute own-

ership, subject to the incumbrance ; but if the mortgage at the time of the sale on execution has been forfeited, the mortgagor has not the right of possession for a moment ; all the right he has is an equity.   In accordance with these views, the supreme court held in *McCraken* v. *Luce*, referred to in *Otis* v. *Wood*, 3 Wendell, 500, that a mortgagor of a chattel having a right to · the possession for a definite period, had an interest which was liable to be sold.  This is in accordance with the doctrine as to mortgages of real estate.  The interest of the mortgagor in possession, and before forfeiture, is liable to be sold on execution.   If therefore in this case the mortgage were valid, Green still had an interest which might be sold on execution, and the purchaser would have a right to redeem. The mortgage did not become absolute until the first of January, 1828 ; the sale was on the 8th of December previous. The bill, however, was properly filed as a bill to redeem on the first January, 1828, supposing the mortgage to be valid, the defendant having refused to accept the money due him.

Another point relied on by the appellant was, that the property passed to Bailey, as assignee of Green, by virtue of the proceedings under the act for the discharge of the persons of insolvent debtors.   The insolvent presented his petition on the 17th October, 1827, and the property was assigned on the 15th December thereafter.   Intermediate these two days attachments were issued, the property seised, judgments obtained, executions issued, and the property sold.   The seisure and sale of the property, says the appellant, was illegal, because it was the fund set apart for the creditors generally.   I am unable to see how the creditors had obtained any lien upon this property ; there had been no act of the officer deciding the right of the insolvent to his discharge, or of the creditors generally to the property ; and until the property is assigned, it is subject to the control of the insolvent.   He may sell it, and though it may be improper in him to do so, the purchaser acquires a valid title.   The insolvent is not bound to prosecute his proceedings ; and if he does so, it is not a matter of course that he is to be discharged, at least, in contemplation of law.   The title to the property cannot be effected until it is assigned according to the statute.   The assignee is not ac-

countable for more than he receives; and before he could receive it in this case, the title of Green was as effectually divested, as if it had consisted of perishable property, and had been consumed. The case *McNielly* v. *Richardson*, 4 Cowen, 607, does not affect this question. That case relates to the debts which are discharged—not to the property which passes under the assignment. Suppose, after presenting the petition, and before the time of appearance, property should come to the insolvent by inheritance or devise to an amount far greater than his debts, will it be contended that he could still go on, obtain his discharge, hold his property and cheat his creditors with impunity? The revised statutes shew the opinion of the legislature on this question. 2 R. S. 20, § 22, 23. The insolvent may be examined as to any changes in his property, whether he has collected any debts or assigned any of his property, clearly implying his power to do so. If a valid assignment may be made by the insolvent voluntarily, it may be made by operation of law. Besides, the appellant has not set up a title as assignee in his answer.

On all the grounds taken by the appellant, I am of opinion he has failed, and that the decree of the chancellor, affirming the decree of the circuit judge, should be affirmed, with costs.

By Mr. Senator ALLEN. There appears to me to be but a single question to be considered in this case, viz. was the conveyance of the property to Bailey made for the purpose of defrauding the creditors of Green, or was it a fair transaction?

The proof in these cases must, in most instances, depend on circumstances connected with the transaction, and is generally presumptive and not direct. It unfortunately rarely occurs that direct testimony is obtained in cases of the kind under consideration, because where fraud is intended, disinterested persons are not let into the motives of the parties, and those immediately interested answer no further than they are compelled to do, and that in general terms, avoiding the question as far as the ingenuity of counsel will permit. " All deceitful practices, and artful devices, contrary to the plain rules of common honesty, are frauds at common law, and punishable there; but for some frauds or deceits there is no remedy

at law, in which cases they are cognizable in equity as one of the chief branches of its original jurisdiction." Bridgeman's Digest, tit. Fraud. In the case of *Sands* v. *Hildreth*, 2 Johns. Ch. R. 35, it was *held* that "fraud may be inferred from circumstances, such as the smallness of consideration, the grantor continuing in possession, and exercising acts of ownership, or circumstances attending the delivery and execution of the conveyance ;" and as the equity powers of this court fully authorize the examination of questions in which fraud is charged, it will be proper to inquire what are the indications of fraud in the case before us.

1. The mortgage professing to be for the payment of *three hundred dollars*, when no such sum was due the morgagee. Here the smallness of consideration, which at most was only for the responsibility of *one hundred dollars*, brings the case, within the above rule ; and the improbability that any sane man would proffer a security, unsolicited, as the appellant avers it was, of three hundred dollars for the loan of another's credit for one hundred, is entirely unaccountable according to the plain rules of common honesty. 2. The aprellant's laconic question to Blake, the counsel of Green, when he handed him the mortgage, *if it was right*," and his answer *that it was*, seems to indicate that he understood the object and intent of the transaction. 3. One of the objects no doubt was to secure Bailey for his responsibility to Palmer, but admitting this, there was fraud as to the balance in respect to creditors ; and this is evident from the fact that property amounting to such balance was, after being sold by Green at Syracuse, released, and the release antidated to agree with the time of the transaction. 4. The conditions of the mortgage also, that Green should pay the three hundred dollars on the 1st of *January*, less than five months from date, when the note in which Bailey was surety was not payable before the 23d of *July* eleven months from date, is a strong indication that more was meant than the mere security of the one hundred dollars to Palmer. 5. There having been no delivery of the property, as admitted by the appellant, and no provision in the mortgage that it should remain in the hands of Green, is another strong badge of fraud. "Possession not going with deeds is admit-

ted on all hands to be a badge of fraud ; and the later cases
have gone rather to establish the point that it is of itself fraud,
and vitiates the deed, unless the vendor's remaining in posses-
sion be consistent with the provisions of the deed ; and it has
been decided that when the possession did not go with the deed,
and the latter was not recorded, the deed was void as to
creditors, though the transaction was acknowledged to be
fair." *Croft* v. *Townsend,* 3 Desauss. 229. If there is any
authority attached to the foregoing case, then the mortgage to
Bailey was absolutely void, as possession did not go with the
deed, nor was it consistent with its provisions that the pro-
perty should remain with the mortgagor ; for how could the
property be security when the mortgagor having it in posses-
sion could dispose of it at pleasure, as in fact he did of a por-
tion of it. 6. After Green had made sale of the coachee and
horses, and about two months after the date of the mortgage, a
release is endorsed on the mortgage for two hundred dollars,
the receipt of which sum is acknowledged by the appellant,
when in fact nothing was received, and after that a delivery
of the property remaining is made by Green. Charles C. Clay
testifies that Green called him as a witness when the property
was delivered ; that the property turned out was a brown
horse and mare, and coachee and harness. There was no
consideration stated by Bailey ; nothing was said of the Pal-
mer note ; the mortgage was not given up or cancelled ; the
only debt mentioned was the hundred dollars which appeared
to be due on the mortgage, and Green said, I turn out this
property to secure the amount of the mortgage. It appears,
therefore, that the delivery of this part of the property was
under the original mortgage, and if that was fraudulent, the
fraud was not cured by this transaction. It might have been
otherwise had the old mortgage been destroyed, and the de-
livery made under a new conveyance as security at the time
of delivery, as that took place previous to the issuing of the
executions and attachments ; but the delivery being under the
original mortgage, and that being fraudulent in its concoction,
the property still remained in Green, and was subject to the
attachments and executions of his creditors. 7. Although the
appellant avers that he had no knowledge of the embarrased

circumstances of Green when he took the mortgage, it is difficult to conceive how he could avoid knowing it, when four of the witnesses testify, that in the summer of 1827, he was reputed to be in very embarrassed circumstances, and could not procure a loan of twenty five dollars on his own note; and also, when, during the same season, in June, 1827, he could not obtain credit of Wiggins for seventy-five dollars, nor of Palmer for one hundred dollars, without the assistance of the appellant.

If, then, the appellant knew of the low credit of Green when he executed the mortgage, that instrument must have been given in contemplation of bankruptcy, and in such case it has been *held*, in *Locke Hinning*, 3 Mass. R. 325, that " a conveyance of property by a debtor to his creditor in contemplation of bankruptcy, by giving a preference among creditors, is fraudulent, notwithstanding it may be made in satisfaction of a *bona fide* debt;" or the conveyance, with such knowledge, must have been made for the purpose of deceiving the creditors into a belief that Green was solvent, particularly when permitted to retain the property in his own possession and apparently exercising ownership over it; and in such case it was *held*, in *Holmes* v. *Crane*, 2 Pick. R. 607, that " if a sale of chattels, whether absolute or conditional, be made for the purpose of deceiving creditors and giving a false credit to the vendor, it is fraudulent and void as to them."

Under all the circumstances of the case, I am unable to divest my mind of the belief that the whole transaction was tainted with fraud towards the creditors of Green; and even viewing the matter in the most favorable light, and supposing that the acts of the appellant, *Bailey,* were not intended to deceive or defraud, there cannot rest a doubt on any mind, as it appears to me, that the acts and intentions of *Green* were fraudulent, and therefore that the mortgage is void as to the respondents. I am therefore of opinion that the decree of the chancellor should be affirmed.

By Mr. Senator BEARDSLEY. Without detaining the court by recapitulating the facts of this case, I think they abundantly sustain the allegation of *fraud*. The question then arises, is the bill so drawn as to sustain the decree?

The respondents allege in their bill "that they have been unable to ascertain the true consideration of the mortgage, which they have been informed and believe was given to defraud the creditors of Green;" and they pray that Green and Bailey may set forth the consideration, and whether it is *bona fide* or fraudulent, and that Bailey be compelled to receive what may be found to be equitably due, and to relinquish his claim on the mortgage to the respondents. The bill also contains a prayer for *general relief*. The defendants below neither demurred nor pleaded to the bill, but went on to answer, and proofs have been taken in the cause. Although unskilfully drawn, the object of the bill seems to have been to set *aside the mortgage if fraudulent,* and to compel Bailey to receive what was actually due *if bona fide*. Had a demurrer been interposed, it is possible the bill might have been held insufficient; but that is not this case. The answer and proofs sustain the allegation of fraud, and the prayer in the bill for general relief entitles the complainants below to *any relief consistent with the case made by the bill,* and not inconsistent with the specific relief sought for. Cooper's Eq. Pl. 14. 2 Madd. Ch. 139. "Formerly it appears to have been thought sufficient if the bill contained only a prayer for general relief, which Mr. *Robbins*, an eminent counsellor, used to say was the best prayer, next to the Lord's prayer; but the practice now is to pray particular relief; though if the particular relief prayed by the bill cannot be given exactly as prayed, the court will assist the particular prayer under the general prayer; but relief inconsistent with the specific relief prayed, cannot generally be given under the general prayer." 2 Madd. Ch. 139. In the present case, the prayer for specific relief is, that Bailey be compelled to receive all that is equitably due on his mortgage, and to discharge or assign the same. If the mortgage was fraudulent, then nothing was equitably due; and although the complainants, by way of compromise, had offered to pay the amount, yet, that having been refused by Bailey, they were under no obligation to pay, (especially after having established the fraud,) and the prayer for general relief is not inconsistent with the specific prayer in the bill.

It was argued by the appellant's counsel that the court of chancery would not lend its aid to courts of inferior jurisdiction. If there is any thing in this suggestion, I cannot perceive how it can become a question in the present controversy. In the first place, the defendants below, the present appellants, have not pleaded to the jurisdiction of the court of chancery. "The court of chancery being a superior court of general jurisdiction, nothing shall be intended to be out of its jurisdiction which is not shown to be so ; and a plea to the jurisdiction must show by what means it is deprived of jurisdiction, and also what other court has jurisdiction." 1 Harr. Ch. 53. So if an objection is made to the court of chancery affording relief, it must be shown that the inferior court is capable of affording a complete remedy according to equity. Jeremy Eq. Juris. 554. As a general rule, the court of chancery has jurisdiction of all cases of fraud where the amount in controversy is of sufficient value. I can see no good reason why it should not aid *justice's courts* where such aid is necessary, especially under the present enlarged jurisdiction of those courts. But how can that question arise ? The property was sold on the executions, and bought in by the respondents *jointly.* They were tenants in common in the property ; as much so as if they had purchased it at private sale of Green or any other person ; they require no aid from a court of chancery to hold this property, or to enforce the jurisdiction of the justice's court ; they, to be sure, require the aid of a court of chancery to ferret out fraud and set aside a hostile fraudulent mortgage. When this mortgage is invalidated, they have a perfect right to the property, and must have brought a joint action, as their interest in the property was joint and not separate.

It was also urged by the appellant's counsel, that inasmuch as Green has presented his petition, and applied for his discharge under the act exempting his body from imprisonment, previous to the respondents recovering judgments and suing out and levying their executions, his assignment under that act related back to the time of presenting the petition, and carried his property with it, notwithstanding the intermediate levy and sale by virtue of the executions. There is

nothing in this suggestion. We have no bankrupt law in this state. The property is vested in the insolvent till he is divested of it by his assignment, and until the assignment is executed, his judgment creditors may take it. The title must be some where, and it is not in the assignee until the assignment is executed. The decree of the cancellor must be affirmed with costs.

By Mr. Senator WESTCOTT. The main questions in this case are—whether the mortgage from Green to Bailey was fraudulent? and whether the application by Green for the benefit of the insolvent laws, and the filing of the inventory of his debts and property was not such an appropriation of his estate for the benefit of *all his creditors*, as would forbid partial collections under proceedings instituted subsequent to the filing such inventory?

The chancellor, in deciding the first question, assumes the fact that the mortgage was taken for a pretended debt, when nothing was due. I have not been able to understand the matter in this way. It appears to me, that at the date of the mortgage, Bailey was at least responsible to Wiggins for $75, and to Palmer for $100, besides some unliquidated small demands claimed as due from Green. The mortgage was made in pursuance of the promise of Green, at the time the Palmer note was executed, and avowedly as security for all liabilities and dealings between the parties. Whatever may have been the views of Green, no designed participation on the part of Bailey, to defraud his creditors, has been brought home to Bailey. It does not appear that the mortgage has ever produced any embarrassment in the collection of any debt due by Green, from the time of its date to the time of his petition for the benefit of the act, or that it was used in any way to the injury of any creditor. For a long time before the issuing of the attachments, no more had been claimed on the mortgage than an indemnity against the Palmer note, a small balance of accounts, and some compensation for time and trouble. How then does it appear that this mortgage has been unfairly or dishonestly used to the injury of any one? or where is the evidence to show that Bailey so understood or intended it? I

have seached in vain for such proof. It is true that Green was permitted to possess and use the property, and that he even disposed of the most valuable part of it ; but it does not appear that such sale was made with the knowledge or consent of Bailey, or that the effect of such sale had any other operation upon the creditors of Green than if the mortgage had never existed. After Green's return from the west, and about ten days before his application for the benefit of the act, he stated his pecuniary difficulties to Bailey, which seems to be the first knowledge of the fact brought home to Bailey, through any direct channel. The chancellor, however, seems to think he was bound to infer it from circumstances. Upon this communication from Green to Bailey a settlement takes place, fair and honest in all its parts, so far as I have been able to understand it, and the mortgage so far satisfied by endorsements as to leave it but a bare indemnity, and no more property retained than would secure the amount; and all this had been done before any collisions between the debtor and his creditors had occurred. So far as Bailey was concerned I have not been able to perceive fraud, either in practice or intent.

Upon the second point, how far the application for the benefit of the act ought to operate as a bar to partial payments, I shall not undertake to decide with much confidence ; but it does seem to me that when an inventory is made and signed according to the act, it must be considered as a distinct appropriation and virtual assignment of all such property for the specific purpose of satisfying the debts of the insolvent in rateable proportions, and cannot be subject to a scramble for priority of judgments and waste of the estate by costs. I consider it a mere deposit with the officer to whom the application is made, until the assignee shall be appointed to dispose of the property and distribute the avails.

Whatever doubts I may feel in differing in opinion from the learned judge and chancellor who have passed upon this question, (and no one entertains a higher opinion of their talents and learning than myself,) I find it impossible to resist the conclusion that they have erred in this case, and that their decisions ought to be reversed.

On the question being put, *Shall this decree be reversed?* all the members of the court except *Senator* WESTCOTT, expressed their opinions in the negative ; whereupon the decree of the chancellor was *affirmed.*